Godwin & Carlton v. Hines 















IN THE
TENTH COURT OF APPEALS
 

No. 10-94-093-CV

     GODWIN & CARLTON, P.C., F/K/A
     GODWIN, CARLTON & MAXWELL, P.C.,
                                                                                              Appellant
     v.

     KATHRYN A. HINES D/B/A 
     LEGAL EAGLES NETWORK,
                                                                                              Appellee
 

From the 162nd District Court
Dallas County, Texas
Trial Court # 92-8249-I
                                                                                                    

O P I N I O N
                                                                                                    

      This is an appeal from a judgment based on a jury verdict granted in favor of Plaintiff-Appellee Kathryn A. Hines (hereinafter called "Ms. Hines"). Ms. Hines originally filed suit
against Godwin & Carlton, P.C. (hereinafter called "the law firm") under theories of breach of
contract, quantum meruit, and fraud based upon an alleged employment recruiter contract between
the law firm and Ms. Hines.
      Trial was had to a jury which rendered a verdict with findings in favor of Ms. Hines on all
causes of action. After verdict, the Defendant-Appellant law firm filed a motion for judgment non
obstante veredicto and alternatively a motion to disregard Special Issues 6, 7, and 8. The trial
court, after hearing, granted the motion to disregard Special Issues 6, 7, and 8 and, in effect,
denied the motion for judgment NOV in part and granted the motion in part. These matters
concerning Special Issues 6, 7, and 8 will be discussed in more detail later in this opinion.
      In 1984 Ms. Hines entered the personnel service business wherein she secured and presented
prospective employees to businesses desiring to hire personnel. In 1986 she first conducted
business with the law firm. From 1986 to 1991, she placed between 20 and 30 temporary staff
personnel with the law firm for which she received $88,000. She had no problems getting paid
by the law firm on a commission basis for the temporary staff placements, nor had the law firm
even questioned the arrangement. On June 1, 1991, Ms. Hines began recruiting attorneys for
permanent placement. Mr. Thomas S. Hoekstra was the first attorney that Ms. Hines undertook
to place, although she was actively seeking to place other attorneys as well during the summer of
1991.
      Ms. Hines first had contact with Mr. Hoekstra on June 7, 1991, when he expressed the desire
to leave the Butler & Binion law firm, and find employment where he could place his "portable
book of business." Mr. Hoekstra on that same day sent to Ms. Hines his resume for her use in
finding him new employment; whereupon, she referred his name to the Godwin & Carlton law
firm and two other firms. Hoekstra was a University of Texas law school graduate, had been
licensed since 1973, and had tried more than 100 cases in his 18-year career, his practice area
being in commercial litigation and bankruptcy.
      On June 20, 1991, Ms. Hines contacted Donald E. Godwin, a member of the Executive
Committee and the law firm's managing partner, about placing attorneys for permanent positions
with the firm. Mr. Godwin told her that the firm was looking for senior-level attorneys with a
portable book of business that would complement the firm's existing business and expand its client
base. Mr. Godwin referred her to George Carlton in the business-litigation section who was also
a member of the Executive Committee.
      When Ms. Hines contacted Mr. Carlton on July 8, she informed him that she was a recruiter
and was working for a fee. He also told her that the law firm was interested in senior-level
attorneys with a portable book of business. Mr. Carlton specifically said that he was already
interested in Dick Wiles and that the law firm would pay her a fee if she could produce Mr. Wiles
as a prospective employee. Mr. Carlton had no objection to the payment of placement fees
generally to Ms. Hines. He then referred her to Dennis Olson whose section had a particular need
for a bankruptcy lawyer.
      On July 9, Ms. Hines contacted Mr. Olson, who gave her the details of the existing opening
for a senior bankruptcy attorney as well as anyone with a portable practice. As did Messrs.
Godwin and Carlton, Mr. Olson also described the firm's desire to consider hiring attorneys who
could bring a portable law practice to the firm.
      In the meeting with Olson, Ms. Hines said she raised the issue of compensation, and an
agreement was reached that if the law firm hired a candidate referred to it by Ms. Hines that she
would receive a commission of 25% of the attorney's first-year earnings.
      There was testimony to the effect that the usual and customary percentage compensation for
recruiters in Dallas in July 1991 was 30% of the first-year earnings. Expert testimony showed that
about 70% of the recruiting services nationally charged a 30% commission contingent on the
referred candidate being hired. Ms. Hines' expert witness, Perry V. Smith, also testified that an
agreement had been reached between Ms. Hines and the law firm. Mr. Olson knew that recruiters
such as Ms. Hines charged a fee for placing attorneys. He also knew that most recruiters work
on a contingency basis and that Ms. Hines would be compensated if she found a lawyer who was
hired by the law firm. Olson himself had been hired by the law firm after referral from a
recruiter.
      According to Ms. Hines, she told Mr. Olson that her fee would be 25% of the first-year
earnings of any candidate hired by the law firm who was referred by her; whereupon, Mr. Olson
then responded, "Yes, I understand how you—how you recruiters work and how you get paid." 
Ms. Hines then told Mr. Olson that she would be "providing him with our fee agreement."
      After the foregoing conversations with members of the law firm, Ms. Hines spoke to Mr.
Hoekstra about the law firm, developed his interest in the firm, and obtained his consent to be
submitted as a candidate.
      Ms. Hines sent a telecopy to Mr. Olson on the day after her meeting with Mr. Hoekstra,
referring Mr. Hoekstra for consideration. The fax transmission was comprised of several
documents, including a confirming letter, an "Employer Paid Fee Policy" sheet, and the resumés
of Hoekstra and another candidate. The July 10 letter and the fee policy both stated Ms. Hines'
fee would be 25% of the first-year earnings. The one-page letter stated: "Finally, per our
conversation, enclosed is a copy of our Employer Paid Fee Policy reflecting our service fee of
25% should you engage the services of a candidate we refer."
      Mr. Olson received these documents and admitted that he read the letter and well may have
read the Employer Paid Fee Policy immediately upon receipt of the fax; he never objected to their
contents or provisions either orally or in writing. He did not object to the 25% fee because "if
that's what the fee is, then that's what she gets paid if she places a lawyer with the firm." Olson
said there was "no question in my mind—that if the law firm hired Tom Hoekstra, it would be
obligated to pay a fee." Mr. Olson further admitted that he knew that Ms. Hines would be owed
a fee if she found a lawyer the law firm hired and that the firm, rather than the candidate, would
pay the recruiter. On August 7, 1991, Mr. Olson sent to Ms. Hines the law firm's brochure for
her use in recruiting for the firm.
      The fee agreement states that a fee would be payable if the law firm hires a referred candidate
within one year of the referral or the most recent communication relating to the candidate. Perry
Smith, the expert witness, testified that the industry custom for the duration of such contingency
search-fee obligations is also one year from the last communication or discussion concerning the
candidate.
      Although Mr. Olson already was familiar with Mr. Hoekstra, until Ms. Hines' referral, he
(Olson) did not know that Mr. Hoekstra was interested in changing jobs or interested in the law
firm. In Ms. Hines' July 10 faxed letter, she stated that normally she sets up the first interview
between the prospective employer and employee. Since Mr. Hoekstra had told Ms. Hines that his
schedule was very hectic, he said it would be easier for him to set up the initial meeting directly. 
That being the case, Ms. Hines asked Mr. Olson whether he wanted to make the first telephone
call to Mr. Hoekstra to set up the interview. After Ms. Hines disclosed Hoekstra's name to Olson,
an interview was set up directly by Olson. After the first interview, Mr. Olson told Ms. Hines
that "Tom Hoekstra is perfect for the position," and suggested that Ms. Hines should not continue
to refer any more prospective candidates for the senior bankruptcy position. Ms. Hines and Mr.
Olson spoke several times during the summer of 1991.
      In July 1991 Mr. Hoekstra left Butler & Binion and accepted a position with Bonnet
Resources Corporation, after which everyone concerned with this situation became aware of
Hoekstra's new job. Bonnet was a client of Godwin & Carlton; nevertheless, Hoekstra still
wanted to go to work for the Godwin & Carlton law firm and a second interview was conducted. 
Hoekstra told Olson that his employment at Bonnet was only "short term anyway." David White,
Chairman of the Banking and Financial Institutions Section, who was the law firm's principal
contact with Bonnet, was concerned about taking an attorney from a client less than a month after
he became employed. White was responsible for the law firm's initial refusal to hire Hoekstra,
the reason being that the law firm did not want to offer Hoekstra a position at this point in time
because he was already employed by the law firm's client (Bonnet), and a decision was made not
to approach Bonnet at that time as to whether it would mind having Hoekstra recruited away from
it. When this decision was made not to make the offer, Hoekstra, Olson, and David White all
knew that Hoekstra's tenure with Bonnet was temporary. Bonnet itself had merely been created
as a short-term entity to work out problem loans for a bank, and they all knew that the client itself
was to be short-lived.
      In August 1991 David White, as well as Olson, called Hoekstra to tell him what was decided. 
Olson then spoke with Ms. Hines, telling her that White did not want to approach the law firm's
client "at the time." Olson told Ms. Hines to stay in touch with Hoekstra and that Godwin &
Carlton "would always find a spot for someone like Tom in our firm." Ms. Hines then spoke with
Mr. Hoekstra, who expressed his prospects for employment at the law firm as follows: "It won't
be right now, but it will probably be within six months that I would be working there." 
Thereafter, Ms. Hines stayed in contact with Mr. Hoekstra, and referred him to another law firm;
nevertheless, Hoekstra was impressed with Godwin & Carlton; he told Ms. Hines "he wanted to
wait it out; he was sure that he would be working there, so he wanted to give it some time."
      During the summer of 1991, Ms. Hines had numerous telephone conversations with Mr.
Olson to check on the status of the various candidates that she had referred. Olson gave her
another search assignment in the fall of 1991 to find a lawyer with a portable practice.
      In November 1991, Ms. Hines spoke with Mr. Olson about some other potential candidates
for the law firm, in which conversation Olson reported that Hoekstra had been the subject of
conversation at the law firm, and Olson inquired how Hoekstra was doing and how the situation
was at Bonnet.
      On December 13, 1991, Hoekstra went on a hunting trip with a friend, who was also a friend
of Frank Skipper, Jr., an associate of Godwin & Carlton. Skipper was a commercial litigator and
associate in the Banking and Financial Institutions Section as well as the Business Litigation
Section. Skipper knew of Hoekstra, because he was one of several attorneys, including David
White, who handled Bonnet's matters on a daily basis and was therefore dealing all the time with
Bonnet personnel. Skipper testified that he was impressed with Hoekstra, and while they were
lying down in the duck blind, he (Skipper) mentioned that Godwin & Carlton were always looking
for good people, and that Hoekstra commented that he would appreciate anything Skipper could
do on Hoekstra's behalf. Apparently Skipper did not know, and Hoekstra did not tell him, that
Hoekstra had been interviewed by the law firm for a job a few months before. Hoekstra
contradicted Skipper by testifying that the matter of possibly going to work for law firm did not
come up at all during the hunting trip but in a subsequent phone call. Thereafter, on December
16 or 17, 1991, Skipper went to senior partner David White and recommended Hoekstra for
employment. White told Skipper, "we made a run at him before but it had been unsuccessful
because of Bonnet."
      Hoekstra reported to Ms. Hines in December 1991 that he was talking to Godwin & Carlton
again, but no one at the law firm informed Ms. Hines that it had re-initiated consideration of
hiring Hoekstra. No one at the law firm had told Ms. Hines during the reconsideration that she
was no longer being considered as the source of Hoekstra's referral.
      The law firm, at trial, took the position that Ms. Hines had nothing to do with the ultimate
decision to employ Hoekstra. Hoekstra left Bonnet in March 1991, and joined Godwin & Carlton. 
It was stipulated at trial that Hoekstra's first-year salary was $140,000. It was further stipulated
at trial that 25% was a reasonable percentage for a placement fee, and the law firm further
stipulated that it generally had paid in the 25-30% range. At 25% of the first-year earnings, the
placement fee for Hoekstra was $35,000.
      Neither Hoekstra nor anyone at the law firm informed Ms. Hines that Hoekstra had been
hired. Ms. Hines learned that the law firm had employed Hoekstra when she read it in the Dallas
Business Journal. Ms. Hines then wrote to Mr. Olson requesting information from which a
statement could be prepared. The law firm wrote a letter to Ms. Hines stating, for the first time,
that "there never has been any written or oral contract with you in this case" and that Hoekstra had
been hired solely as a result of Skipper's hunting trip.
      The type of law practice for which Hoekstra was employed at the law firm did not
substantially differ from that which Ms. Hines originally presented him. In other words, this was
not disputed. Hines' expert witness, Perry Smith, testified that the value of her services at the
time and place they were rendered was 30% of Hoekstra's first-year earnings, that such percentage
was reasonable, necessary, and usual as a fee; but that the agreed-upon 25% range was within the
acceptable range. Carlton agreed that 25% was a reasonable fee and within the range the law firm
usually paid.
      Ms. Hines d/b/a Legal Eagles Network brought suit against Godwin and Carlton, P.C.,
alleging causes of action under breach of express or implied contract, quantum meruit, and for
violation of the Private Employment Services Act, Tex. Rev. Civ. Stat. Ann. art. 5221a-7. 
Trial was had to a jury which found:
(1)Ms. Hines and the law firm agreed that if the law firm engaged the services of a
candidate that was referred to them directly or indirectly through her efforts within
one year after their most recent communication regarding the candidate, that the law
firm would pay a fee of 25% of the candidate's first-year's gross compensation.
 
(2)The law firm failed to comply with the agreement.
 
(3)$35,000 would fairly and reasonably compensate Ms. Hines for her damages that
resulted form the law firm's failure to comply.
 
(4)Ms. Hines performed compensable work for the law firm.
 
(5)The reasonable value of such work at the time and place it was performed is
$35,000.
 
(6)A representative of the law firm made a false statement or concealed a material fact
for the purpose of obtaining the employment of Thomas S. Hoekstra by or through
Ms. Hines which was the producing cause of actual damages to Ms. Hines.
 
(7)$35,000 would fairly and reasonably compensate Ms. Hines for damages resulting
from such conduct.
 
(8)The false statement or concealed material fact referred to in Special Issue No. 6
above was committed knowingly.
 
(9)Reasonable attorneys fees for Ms. Hines in this case are as follows:
 
a.For preparation and trial = $21,500.
 
b.Appeal to Court of Appeals = $15,000.
 
c.Making or responding to an Application for Writ of Error to the Supreme
Court of Texas = $5,000.
 
d.If Application for Writ of Error is granted = $5,000.

      The jury made an additional finding, as a part of Special Issue No. 9, that a reasonable fee
for Ms. Hines' service in this case, stated as a percentage of Ms. Hines' recovery, is 33-1/3
percent.
      After the verdict, the law firm filed a motion for judgment NOV, alternatively designated
Defendant's Motion to Disregard Jury Findings. The trial court granted the motion in part,
disregarding the jury's answers to Special Issues 6, 7, and 8, and entered its judgment awarding
Ms. Hines her actual damages in the amount of $35,000, pre-judgement interest, attorneys' fees
in accordance with the jury verdict, court costs and post-judgment interest.
      Defendant-Appellant Godwin & Carlton comes to this court on nine points of error as follows:
Points of error 1, 2, and 3 assert that there is no evidence and legally insufficient
evidence to support the verdict and judgment regarding the existence of an enforceable
contract, and that such holding is against the great weight and preponderance of the
evidence.
Points of error 4, 5, and 6 contend that there is no evidence and legally insufficient
evidence to support the verdict and judgment based upon a quantum meruit theory of
recovery in favor of Plaintiff, and that such is against the great weight and preponderance
of the evidence.
Points of error 7, 8, and 9 argue that there is no evidence and legally insufficient
evidence to support Plaintiff's entitlement to attorneys fees, and that such entitlement is
against the great weight and preponderance of the evidence.
      We revert to Appellant's first, second, and third points. Without repeating the facts bearing
upon these points, we hold the evidence is legally and factually sufficient to support the existence
of an enforceable contract between Ms. Hines and the law firm, that the law firm failed to comply
with the agreement, and that $35,000 would reasonably compensate Ms. Hines for the law firm's
breach thereof. From the four corners of the record, the evidence is ample to show a meeting of
the minds, a breach of the agreement, and the reasonable damages. Calvert, "No Evidence" and
"Insufficient Evidence" Points of Error, 38 Tex. L. Rev. 361 (1960); also see Mal Spinrad of St.
Louis, Inc. v. Karman, Inc., 690 S.W.2d 460 (Mo. App. 1985).
      Likewise, with regard to Appellant's fourth, fifth and sixth points, we hold the evidence is
legally and factually sufficient to support the jury findings that Plaintiff-Appellee is entitled to
recovery under the quantum meruit theory; and that such findings are not against the great weight
and preponderance of the evidence.
      With reference to Appellant's points seven, eight, and nine, we hold the evidence is legally
and factually sufficient to support the jury's findings entitling Plaintiff-Appellee to the recovery
of attorneys fees. Appellant contends Appellee is not entitled to recovery of attorneys fees because
Appellee failed to establish either a contract or quantum meruit. We do not agree.
      Appellee asserts two cross-points of error in which she contends the trial court erred in
disregarding the answers to jury findings to Special issues 6, 7, and 8, and in failing to render
judgment for treble damages on the reasoning that Tex. Rev. Civ. Stat. Ann. art. 5221-7, §
3(b), does not apply to this case. Also, Appellee contends there is some evidence that Appellant
knowingly violated article 5221-7, § 3(b); therefore (she says) the trial court should have trebled
the damages. We do not agree.
      Section 3(b)(1) of article 5221-7 provides:
(b)An employer seeking employees or a person seeking employment may not:
(1) make any false statement or conceal any material fact for the purpose of
obtaining employees or employment by or through a personnel service; . .
. .
      Section 6 of this Act provides, in effect, that if a person recovers damages for a knowing
violation of this Act, that the actual damages shall be trebled.
      Specifically, the conduct of which Appellee accuses Appellant that allegedly was the
producing cause of Appellee's damages are:
(1)Concealing a material fact that Don Godwin or another Executive
Committee member would try to renegotiate the fee payable to Hines before
an offer was extended to a candidate.
(2)Concealing a material fact that Godwin had a practice of dealing with
recruiters that only Don Godwin approved the payment of a replacement fee
to a recruiter.
(3)Making a statement that the firm was looking for an experienced attorney
with a substantial portable practice even outside of the described opening
and that Hines would be paid a fee for such hiring.
      One of the reasons given by the trial court for disregarding the jury's answers to 6, 7, and 8
was that there is no evidence that the Appellant knowingly violated art. 5221-7, § 3(b). We agree. 
There is no evidence in the record to support the jury finding that Appellant made any false
statements or concealed any material fact knowingly. Even if we should say for the sake of
argument that Appellant's "awareness" may be inferred, it is done knowingly under Section 6 only
if "objective manifestations" indicate that a person acted with actual awareness. The record shows
no objective manifestation that suggest the existence of any awareness of false statements.
      Additionally, the alleged misconduct that Cross-Appellant accuses Cross-Appellee of, as set
out hereinabove, would be relevant and have a bearing upon the question of whether there was a
contract. Since there was a contract, the submission of Issues 6, 7, and 8 were properly
disregarded by the trial court. For these reasons, we overrule Appellee's cross-points.
      Judgment of the trial court is affirmed.
 
                                                                               JOHN A. JAMES, JR.
                                                                               Justice (Retired)

Before Chief Justice Thomas,
      Justice Cummings, and
      Justice James (Retired)
Affirmed
Opinion delivered and filed December 13, 1995
Do not publish